IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEROY DADE, JR.,<br>Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 24-CV-6162 |
| | : | |
| JOSEPH WALSH, *et al.*,<br>Defendants. | : | |

## MEMORANDUM

**SCOTT, J.**                                                         APRIL 14, 2026

Plaintiff Leroy Dade, Jr., proceeding *pro se* and *in forma pauperis*, commenced this civil

action by filing a *pro se* Complaint (ECF No. 1) that named numerous Defendants employed at

SCI Phoenix by the Pennsylvania Department of Corrections ("DOC") and Wellpath, the DOC's

medical contractor, as well as two Defendants employed at an outside hospital.  Currently before

the Court are Motions to Dismiss filed by the various Defendants, (ECF Nos. 32, 48, 55, 56),

Dade's responses, (ECF Nos. 37, 58, 60, 62, 63, 69, 70), and replies from the Defendants, (ECF

Nos. 38, 64, 65, 68).  For the following reasons, the Court will grant in part and deny in part the

Motions to Dismiss.

## I.    FACTUAL ALLEGATIONS[1]

In his Complaint, Dade alleges that he had severe arterial blockages in his neck and heart

---

[1] Following a stay of this action pending the outcome of Defendant Wellpath's Chapter 11 proceedings, (*see generally* ECF Nos. 10, 14, 27), the Court granted Dade leave to file an amended complaint, and then an extension of time to do so, (*see* ECF Nos. 29, 31).  When Dade did not file an amended complaint within the time allotted, the Court deemed his original Complaint the governing pleading in this case.  (*See* ECF No. 34.)  Accordingly, the facts set forth in this Memorandum are taken from Dade's Complaint, (ECF No. 1).  The Court has also considered the Exhibits, (ECF No. 2), and Affidavit, (ECF No. 5), that Dade submitted in the same envelope as his Complaint, which are relied upon by the Complaint and clarify the

and that medical treatment for his condition was delayed for over one and a half years for non-medical reasons. (*See* Compl. at 1.)  He states that during the delay in treatment, he "suffered strokes, (TIAs) transient ischemia attacks, temporary blindness in one eye," and other physical and psychological effects. (*Id.* at 2.)  In the Affidavit that Dade attached to his Complaint, he clarifies the timeline of the events underlying the facts pleaded in the Complaint. (*See generally* ECF No. 5.)  In 2018, Dade was seen by Defendant Physician's Assitant Jeanne DeFrangesco, to whom Dade expressed "feeling pain in the right side of [his] neck" and "a lack of oxygen getting to [his] brain," which led to him "temporarily losing consciousness at times." (*Id.* at 1.) DeFrangesco ordered an ultrasound and told Dade that if he did not "hear anything from her or medical that would be a good thing," but she did not follow up and Dade "never received verification or results." (*Id.*)

In 2023, Dade "was again experiencing chest pains which extended up into chin on both sides." (*Id.*)  He was seen by Defendant Physician Assistant Joseph Walsh in January 2023, who ordered another ultrasound that revealed "bi-lateral carotid stenosis with 100 percent blockages on the right side and 50-70 percent blockage on the left side." (*Id.*; *see also* Compl. at 8.)  Walsh

---

allegations made in the Complaint. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (explaining that, in evaluating a motion under Fed. R. Civ. P. 12(b)(6), a court should consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record," as well as any "document integral to or explicitly relied upon in the complaint" (citations omitted)); *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir. 1992) (explaining that, when evaluating a motion to dismiss, a court may look to "allegations contained in the other court filings of a *pro se* plaintiff" to clarify statements made in the complaint (citing, *inter alia*, *Hughes v. Rowe*, 449 U.S. 5, 10 (1980))); *cf. Maio v. Aetna, Inc.*, 221 F.3d 472, 485 n.12 (3d Cir. 2000) ("[W]hile this case involves a motion to dismiss under Rule 12(b)(6), the Supreme Court . . . confirmed that we may use appellants' brief 'to clarify allegations in the complaint whose meaning is unclear.'" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000))).  The Court adopts the pagination assigned to these filings by the CM/ECF docketing system.  Grammar, spelling, and punctuation errors are cleaned up where necessary, including the names and proper titles of Defendants misidentified in the Complaint and clarified by counsel.

told Dade that his "condition was urgent and an emergency and needed immediate attention by a vascular surgeon." (ECF No. 5 at 1-2.)  Between January and May 2023, Dade "attended several visits to sick call speaking with several Wellpath and medical staff members," at which he discussed the delays in ordering this treatment; at one visit, he asked Defendant Walsh to prescribe him blood-thinning or anti-coagulant medication, but Walsh refused.  (*Id.* at 2.)  After filing grievances, he went to another sick call with Walsh at "the beginning of June 2023" because he still had not received any information about his treatment plan, and Walsh told him that the delays were due to "the other six [hundred] inmates around the state" who were also waiting for outside medical services.  (*Id.* at 3; *see also* Compl. at 8.)

Dade attached Exhibits to his Complaint, including grievance number 1029935, dated April 12, 2023, in which he complained of delays following Defendant Walsh's diagnosis, alleged that he had experienced two TIAs and other symptoms, noted that he "had requested care and treatment . . . when he was originally diagnosed," asserted that "no effort was made to improve the blood flow," and asked "to be seen by a vascular specialist as soon as possible to receive proper diagnosis and treatment," as well as for "compensation" and "damages."  (*See* ECF No. 2 at 2.)  An initial review response dated May 12, 2023, stated: "Vascular surgery consult entered and approved on 01/27/2023, 101 days since approval, not seen and currently overdue as of this date.  Grievance Uphold in part – due to medical delays.  Grievance denied in part as no monetary compensation will be provided."  (*Id.* at 3.)  Dade contacted Defendant Britney Huner, the Corrections Health Care Administrator ("CHCA") at SCI Phoenix, through a separate request on May 22, 2023, asking about scheduling his visit to the vascular surgeon, and received a response the next day stating that his appointment had been scheduled.  (*See id.* at 12.)  On May 23, 2023, Dade appealed his grievance to Defendant Superintendent Terra, asserting that

he had not been seen by a vascular surgeon. (*Id.* at 4.)  Terra's decision, dated June 6, 2023, then upheld the grievance officer's initial response on the basis of "medical delays," and stated: "In speaking with the medical staff, they assured me the [vascular] consult was scheduled, however, the date cannot be disclosed to you due to security reasons." (*Id.* at 5.)

Also on June 6, 2023, Dade was taken outside the prison to see Defendant Evan R. Deutsch, a vascular surgeon; however, when he arrived, Dade "was informed that they had no record of why [he] was there," so "they had contacted SCI Phoenix and were waiting for the jail to fax over [his] information." (ECF No. 5 at 3.)  Deutsch "ordered a CT scan and for [Dade] to see a neurologist, before returning" to SCI Phoenix. (*Id.*)  Dade apparently did have a CT scan but was not scheduled to see a neurologist; he made "several more visitations to sick call on different days," and at one of these visits on an unspecified date between May and August, he was told by Defendant Ashley Senkowski, PA "that there [was] no specific plan of action for [his] treatment." (*Id.*; *see also Compl.* at 8-9.)

On June 21, 2023, Dade filed an appeal of Terra's decision on grievance number 1029935, asserting that he "had no resolution . . . concerning [his] medical condition," and arguing that he "should have been on an operation table within 12-14 days" of his diagnosis. (ECF No. 2 at 6.)  He received a response from the DOC's Office of Inmate Grievance and Appeals dated August 3, 2023, which stated that it was "solicit[ing] input from an appropriate Central Office Bureau," so the final review decision would be delayed. (*Id.* at 7.)  On November 14, 2023, the Grievance Office issued its final decision, noting that the Bureau of Health Care Services had "reviewed [Dade's] concern of not being provided proper medical care," upholding the prior responses to the grievance, and determining "that the medical care provided was reasonable and appropriate." (*Id.* at 8.)

4

Dade states that between June and October 2023, he wrote to and spoke with Defendant Huner about the delays. (*See* ECF No. 5 at 4; *see also* Compl. at 3, 8.) He alleges that Huner asked him if he had family in the Philadelphia area and discussed the possibility of compassionate release, which Dade asserts is normally only available when "inmate patient[s] are nearly on their death bed." (ECF No. 5 at 4; *see also* Compl. at 8.) He avers that Huner reviewed his file and said that she did not understand why Defendant Deutsch "was ready to operate on June 6, 2023," but had "changed his mind" by October 2023, before Dade had seen a neurologist or received all his prescribed medications. (ECF No. 5 at 4.) Dade's Exhibits include a written request to Huner dated October 19, 2023, in which Dade asserted that he had not seen a neurologist and that Huner had not followed up with him as promised about the confusion over his planned surgery. (*See* ECF No. 2 at 13.) The response to his request stated that "a new consult for vascular . . . will be scheduled." (*Id.*) Dade states that Huner told him at the time that she "does all the scheduling[, a]nd she would back track and try to fix it." (ECF No. 5 at 4.) Dade was sent back to see Defendant Deutsch sometime in October or November of 2023. (*See id.*) The Court understands Dade to allege that Deutsch told him that he "will not be getting an operation," because Dade still needed to see a neurologist before Deutsch could "discuss the risk" and "allow" Dade to decide on surgery. (*Id.* at 4-5.)

In December 2023, Dade went to the medical department complaining of "numbness and tingling in his arm and shoulder" and "trouble breathing." (*Id.* at 5.) Defendant Elliott Yodh told Dade that he should come back to medical if he "lo[st] control of his bowels and bladder . . . , and then they will send him for outside medical care." (*Id.*; *see also* Compl. 3.) The Court understands Dade to allege that in February or March 2024, he "finally saw a neurologist via telehealth/telemed and she told [Dade] she would order an MRI and see if they could get up there

and clean the blockages out."[2] (ECF No. 5 at 5.) It is not clear whether the MRI was scheduled, but Dade asserts that he tried "several times" to get the name of the neurologist whom he had met with, but Defendants Walsh, Senkowski, and Yodh all told him "that her name was somehow removed" from their system. (*Id.*)

On May 9, 2024, Dade signed up for a sick call because he "was feeling light-headed, dizzy and confused." (*Id.*) He was seen four days later, on May 13, by Defendant Nurse Practitioner Jennifer Frusco, who asked if he had ever had his blood pressure taken while lying, sitting, and standing, which he had not. (*Id.*) Frusco sent him to "triage," where Nurse William Gonzales told Dade that his blood pressure was "deathly high," with readings of 210/102 lying, 205/100 sitting, and 235/102 standing. (*Id.* at 5-6.) Frusco and Gonzales administered 20mg of Hydralazine and sent Dade back to his cell. (*Id.* at 6.) However, when Dade returned to his cell block, he was told by a corrections officer to go back to medical because "[t]hey decided that [Dade] was having a medical emergency now." (*Id.*) Dade was transported to Einstein Montgomery Hospital, where he had surgery and stayed from May 13-27, 2024. (*Id.*) He asserts that Defendant Dr. Pinky Saikia later denied him nitroglycerin that was prescribed after his surgery. (Compl. at 5, 15.)

Dade states that the delays in treatment caused him to have "prolonged pain," TIAs, "transient blindness in [his] left eye," cognition problems, and language difficulties, and led to the "complete deterioration of [his] right carotid artery." (*Id.* at 6-7.) He asserts that, even after his surgery in May 2024, he was paralyzed on the right side of his body for "several days." (*Id.*) He seeks damages. (Compl. at 23.)

---

[2] Dade states this occurred in "February or March 2023," but the Court infers that Dade made a typographical error as to the year based on context.

## II.    PROCEDURAL HISTORY

Dade's Complaint was signed and dated November 12, 2024. (*See* Compl. at 26.) Submitted with his Complaint in the same envelope were numerous Exhibits, (ECF No. 2), a Motion for Leave to Proceed *In Forma Pauperis* and supporting Account Statement, (ECF Nos. 3, 4), an Affidavit containing factual averments, (ECF No. 5), a Motion to Appoint Counsel, (ECF No. 6), and completed USM-285 Forms, (ECF No. 7). Dade subsequently submitted further Exhibits, (ECF No. 11), in support of his Motion to Appoint Counsel.

Before the Court took any action on Dade's submissions, Counsel for Wellpath and its employees entered an appearance, (ECF No. 9), and filed a Suggestion of Bankruptcy, (ECF No. 10), citing to *In re Wellpath Holdings, Inc.*, No. 24-90533 (Bankr. S.D. Tx.). The Court then stayed this case pursuant to 11 U.S.C. § 362(a) and inherent docket-management authority. (ECF No. 14 (citations omitted).) Dade notified the Court that he had submitted a Proof of Claim in the bankruptcy case.[3] (*See* ECF No. 19.) On May 20, 2025, the Court recognized that Wellpath's Chapter 11 Plan of Reorganization had been confirmed, lifted the stay on this case, and granted Dade *in forma pauperis* status and leave to file an amended complaint. (*See* ECF No. 27.) However, when Dade failed to submit an amended complaint despite subsequent Orders from the Court extending his time to do so, the Court deemed his original Complaint the governing pleading in this case and directed service on the Defendants who had not yet appeared.[4] (*See* ECF Nos. 29, 31, 34.) Wellpath has moved for dismissal based on its discharge

---

[3] Dade's Proof of Claim appears on the bankruptcy court's docket, *see In re Wellpath*, No. 24-90533, at Dkt. No. 1351, and Dade is also included in the "List of Creditors" report.

[4] While the Court did not allow Dade to engage in piecemeal amendment of his Complaint, the Court did take notice that Dade had identified John Doe Defendants and corrected the spelling of certain Defendants' names in submissions subsequent to the Complaint. (*See* ECF No. 34.)

in bankruptcy. (ECF No. 32.) Additionally, Motions to Dismiss have been filed on behalf of all Defendants, with some Defendants seeking summary judgment in the alternative. (*See* ECF Nos. 48, 55, 56.) Dade has filed responses to each Motion, (*see* ECF Nos. 37, 58, 60, 62, 63, 69, 70), and the Court has received replies to Dade's responses, (*see* ECF Nos. 38, 64, 65, 68), so the Motions are fully briefed and ripe for disposition.

## III.   STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (citation omitted). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555.) "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

To determine whether a complaint filed by a *pro* se litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed, contains facts sufficient to state a plausible claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (noting that *pro se* filings are construed liberally). Additionally, since Dade is proceeding *in forma pauperis*, the Court may independently screen his Complaint and dismiss it "at any time" pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) if, among other things, it fails to state a claim. *Brown v. Sage*, 941 F.3d 655, 662 (3d Cir. 2019) (*en banc*) ("To repeat, the statute requires a court to dismiss an IFP complaint 'at any time' if it determines that the complaint is frivolous, malicious, or fails to state a claim."). The standard under this screening provision is the same standard that governs a dismissal under Rule 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999).

## IV.   DISCUSSION

### A.   Rule 8

Some Defendants move to dismiss on the ground that Dade's Complaint fails to comply with Federal Rule of Civil Procedure 8. (*See* ECF No. 55 at 10; No. 56 at 7-8.) To conform to Rule 8 and survive a motion to dismiss, a pleading must contain a short and plain statement showing that the plaintiff is entitled to relief. *See* Fed. R. Civ. P. 8(a)(2); *Garrett v. Wexford Health*, 938 F.3d 69, 91 (3d Cir. 2019). The United States Court of Appeals for the Third Circuit has explained that in determining whether a pleading meets Rule 8's "plain" statement requirement, the Court should "ask whether, liberally construed, a pleading 'identifies discrete defendants and the actions taken by these defendants' in regard to the plaintiff's claims."

*Garrett*, 938 F.3d at 93 (citation omitted). "[A] pleading that is so 'vague or ambiguous' that a defendant cannot reasonably be expected to respond to it will not satisfy Rule 8." *Id.* (citations omitted). The important consideration for the Court is whether "a pro se complaint's language . . . presents cognizable legal claims to which a defendant can respond on the merits." *Id.* at 94 (citations omitted).

While Dade's Complaint is at times repetitive and relies to some degree on his separate Affidavit to clarify his factual allegations, the Complaint also names discrete Defendants, connects them to the facts as pleaded, states a basis for the claims against them, and is organized in numbered paragraphs. While some of Dade's claims nonetheless fail for the reasons discussed in this Memorandum, the Complaint substantially complies with Rule 8 and will not be dismissed on that basis.

## B.    Constitutional Claims

Dade asserts claims for deliberate indifference to his medical needs, in violation of the Eighth Amendment.[5] The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983. "Section 1983 does not, by its own terms, create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (citations omitted); *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004) ("Section 1983

_____

[5] To the extent Dade sought to assert a due process claim, (Compl. at 25), as some of the Defendants understood, there is no basis for a due process claim here because Dade's claims are clearly governed by the Eighth Amendment rather than the Due Process Clause, *see Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 261 (3d Cir. 2010) ("Betts's claims concern his conditions of confinement and an alleged failure by Defendants to ensure his safety. Because these allegations fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment, we hold that the more-specific-provision rule forecloses Betts's substantive due process claims." (footnote omitted)).

is not a source of substantive rights," but is merely a means through which "to vindicate violations of federal law committed by state actors." (citing *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002))). "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted); *see also Groman v. Twp. of Manalapan*, 47 F .3d 628, 638 (3d Cir. 1995) ("The color of state law element is a threshold issue; there is no liability under § 1983 for those not acting under color of law." (citation omitted)).

To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "A serious medical need is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a layperson would easily recognize the necessity for a doctor's attention." *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir. 2023) (cleaned up). "A serious medical need exists where 'failure to treat can be expected to lead to substantial and unnecessary suffering.'" *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (quoting *Colburn v. Upper Darby Township*, 946 F.2d 1017, 1023 (3d Cir. 1991)).

Deliberate indifference is properly alleged "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical

reasons, [or] (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Montanez v. Price*, 154 F.4th 127, 141 (3d Cir. 2025) (citation omitted), *petition for cert. filed*, 94 U.S.L.W. 3289 (U.S. Mar. 11, 2026) (No. 25-1073). "[P]rison officials may not 'deny reasonable requests for medical treatment . . . when such denial exposes the inmate to undue suffering or the threat of tangible residual injury.'" *Durham v. Kelley*, 82 F.4th 217, 230 (3d Cir. 2023) (quoting *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017)); *see also Montanez*, 154 F.4th at 141 ("[The deliberate indifference] standard can also be met by a defendant abandoning a prisoner in a condition that unreasonably exposes him to the threat of tangible residual injury." (internal quotation marks and citation omitted)).

"Not every complaint of inadequate prison medical care rises to the level of deliberate indifference." *Anderson v. Price*, No. 22-3058, 2023 WL 5814664, at *2 (3d Cir. Sept. 8, 2023) (*per curiam*). "Where a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* at 228 (cleaned up). "Nonetheless, there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." *Id.* (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978)). Deliberate indifference includes "situations where 'necessary medical treatment is delayed for non-medical reasons.'" *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582

12

(3d Cir. 2003) (quoting *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)). It "is also evident where prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates," or "when prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment." *Monmouth Cnty.*, 834 F.2d at 346-47 (cleaned up).

### 1.  Claims against Wellpath and Wellpath Employees

#### a.  Policy Claim Against Wellpath

Dade has stated a claim to relief against Wellpath for deliberate indifference to his medical needs by delaying his necessary treatment for non-medical reasons.[6] A private corporation under contract to provide medical services at a jail or prison may be liable under § 1983 in certain circumstances. The United States Court of Appeals for the Third Circuit has held that "a private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'" *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale*, 318 F.3d at 583

---

[6] Dade also asserts a claim against Wellpath for "negligent hiring" of Defendant Letizio. (Compl. at 20-21.) "To succeed on a negligent hiring theory under *Monell*, a plaintiff must show that the hiring decision 'reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow.' An official is deliberately indifferent only when 'adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right.'" *Kobrick v. Stevens*, 763 F. App'x 216, 221 (3d Cir. 2019) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 411 (1997)). Dade alleges extensive facts about Defendant Letizio's background, including the 2016 suspension and subsequent 2018 reinstatement of Letizio's medical license, after which he was hired by Wellpath. (*See* Compl. at 16-19.) However, even taking Dade's allegations as true, and while not condoning the conduct Dade describes, the Court concludes that these facts are not sufficient to infer that Wellpath should have reasonably "conclude[d] that the plainly obvious consequence of the decision to hire [Letizio] would be the deprivation of a third party's federally protected right," so he has not stated a claim to relief for negligent hiring. *Kobrick*, 763 F. App'x at 221.

(applying the municipal-liability framework of *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), to claims against medical contractor)).  To hold a private health care company like Wellpath liable for a constitutional violation under § 1983, a plaintiff must allege Wellpath had "a relevant . . . policy or custom, and that the policy caused the constitutional violation [he] allege[s]." *Natale*, 318 F.3d at 583-84 (citing *Brown*, 520 U.S. at 404); *see also Menkins v. Dep't of Corrs.*, No. 24-5258, 2025 WL 2778096, at *4 (E.D. Pa. Sept. 26, 2025) ("Because [defendant] is a private company contracted by a prison to provide health care for inmates, . . . it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs." (quoting *Lomax v. City of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017)))).  A plaintiff asserting such a claim "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the pleading standard.  *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009).  "A plaintiff must also allege that the policy or custom was the 'proximate cause' of his injuries." *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).  This can be done "by demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation" alleged. *Id.* (citation omitted).

Dade alleges that Wellpath has a policy of conducting "collegial review" that, for the purpose of reducing costs, intentionally delays or denies referrals for treatment by providers outside the prison. (*See* Compl. at 10-13.)  Taken together, Dade's allegation that the "collegial review" policy caused the delay in his treatment, the specific facts he pleads to support his claims—particularly as to his emergent need for care and the delay he experienced in attempting to obtain that care—and the documentary evidence he relies upon, are sufficient to state a

14

plausible claim to relief.[7] *See Weaver v. Wellpath, LLC*, No. 23-0258, 2024 WL 3584579, at *2, 7 (W.D. Pa. July 30, 2024) (concluding that plaintiff stated a claim to relief based on allegation that Wellpath's "collegial review" policy delayed necessary medical treatment); *Rudolph v. Wellpath*, No. 22-0382, 2023 WL 2563083, at *7-10 (M.D. Pa. Mar. 17, 2023) (same).

### b.    Wellpath's Bankruptcy Discharge

Although Dade's Complaint states a valid policy claim against Wellpath, he cannot proceed against Wellpath itself. Wellpath was discharged from liability by the United States Bankruptcy Court for the Southern District of Texas, Houston Division, for claims that arose prior to November 11, 2024. *See In Re Wellpath Holdings, Inc.*, No. 24-90533 (Bankr. S.D. Tx.), ECF Nos. 2596, 2679, 2680; *see also* 11 U.S.C. § 524(a)(2) ("A discharge in a [Chapter 11

---

[7] Wellpath argues that Dade's *Monell* claim must fail because he did not specifically identify a policy or policymaker. (*See* ECF No. 55 at 23-25.) First, that assertion about Dade's pleading is incorrect on both fronts. Dade identifies the policy as "collegial review" and defines it at length, and he plausibly identifies Defendant Letizio as a relevant policymaker for Wellpath at SCI Phoenix. (*See* Compl. at 10-14.) The Court is unpersuaded by Wellpath's argument to the contrary, which amounts to nothing more than a factual dispute that is not a valid basis for a motion to dismiss. (*See* ECF No. 55 at 24 ("Dr. Letizio is the Medical Director at SCI-Phoenix. He does not create policies, procedures or customs for Wellpath, LLC. Wellpath and its employees must follow the DOC's policies and procedures. Wellpath does not have any.").) Second, it is not clear to the Court that the identity of the specific policymaker is essential to Dade's ability to proceed with claims against Wellpath. *See Harbaugh v. Bucks County*, No. 20-1685, 2022 WL 16722333, at *4 (E.D. Pa. Nov. 4, 2022) ("Even if, for sake of argument, Plaintiff were required to identify a specific policymaker to establish an affirmative policy, this would not preclude Plaintiff from proceeding on failure to train and failure to supervise theories. All in all, a jury is permitted to find *Monell* liability if [the relevant entity] 'turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights' such that '[unnamed] policymaker[s,] can reasonably be said to have been deliberately indifferent to the need.' Plaintiff need not identify the specific municipal policymaker to prove it." (first citing *Forrest v. Parry*, 930 F.3d 93, 106-06 (3d Cir. 2019); then quoting *Parkell v. Danberg*, 833 F.3d 313, 338 (3d Cir. 2016))). Dade's argument is that, despite the medical advice from the practitioners who treated him that he had an emergent need for referral to an outside provider, Wellpath's "obviously inadequate practice" was designed to—and did in fact—delay that treatment, which violated his constitutional rights and injured him. His pleading is thus sufficient to state a claim to relief.

15

bankruptcy] case . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.").  As part of Wellpath's Chapter 11 reorganization, a Liquidating Trust has assumed Wellpath's liability "for all General Unsecured Claims, including personal injury and wrongful death claims that arose prior to November 11, 2024."  Order Confirming Ch. 11 Plan, *In re Wellpath Holdings*, No. 24-90533 (Bankr. S.D. Tex. May 1, 2025), ECF No. 2596 at 107 (Assumption of General Unsecured Claims by the Liquidating Trust).  In an Order dated January 25, 2026, the United States Bankruptcy Court for the Southern District of Texas clarified that, in accordance with the Trust Distribution Procedures ("TDPs") adopted when confirming Wellpath's Chapter 11 plan and establishing the Liquidating Trust:

> Holders of General Unsecured Claims arising from alleged pre-petition personal injury tort or wrongful death may proceed in the appropriate civil court and litigate such claim with the Trust included as a nominal defendant.  As a nominal defendant, the Trust is not required to file answers, participate in discovery or hearings, or take an active role in any such litigation; provided, however, that nothing herein or in the Plan or TDPs shall prevent the Trust from participating in any such case at the direction of the Trustee or engaging in settlement discussions for purposes of determining stipulated Allowed Claim Amounts at the discretion of the Trustee.

Revised and Amended Clarifying Order, *In re Wellpath SF Holdco*, No. 24-90566 (Bankr. S.D. Tx. Jan. 25, 2026), ECF No. 1279 at 2 (cleaned up).  Dade properly and timely filed a proof of claim as to his claims against Wellpath, (*see* ECF No. 19), so he may proceed in this Court against the Liquidating Trust as a nominal defendant, under the terms of the Plan and subsequent

Clarifying Order. And because Dade opted out of the third-party release in the Chapter 11 Plan,

his claims against any Wellpath employees are not affected by Wellpath's bankruptcy.[8]

Accordingly, the Court will grant Wellpath's Motion to Dismiss It as a Party Following

Bankruptcy Discharge, (ECF No. 32), and Wellpath will be terminated as a party to this action.

Based on the Liquidating Trust's assumption of Wellpath's liability for claims like Dade's, the

Clerk of Court will be directed to add the Liquidating Trust as a defendant and to take steps to

effect service of process on the Liquidating Trust through its Trustee and Counsel. *See*

Liquidating Trust Agreement, *In re Wellpath*, No. 24-90533 (Bankr. S.D. Tx. May 9, 2025), ECF

No. 2679 at 298, 387; *see also* Fed. R. Civ. P. 21.

To clarify for Dade's and all parties' benefit: the Court will add the Liquidating Trust as

the Defendant for Dade's claims against Wellpath. If Dade prefers to take his claims against

Wellpath and the Liquidating Trust out of this Court and proceed under the alternative dispute

resolution procedures outlined in the Wellpath Chapter 11 Plan and TDPs, rather than keeping

those claims in this case with his claims against the other Defendants, he may file a motion with

the Court to have his claims against Wellpath and the Liquidating Trust dismissed without

prejudice to pursuing those remedies. However, for the sake of judicial efficiency and on the

---

[8] Dade informed this Court of his having opted out of the third-party release and provided a copy of his opt-out ballot. (*See* ECF No. 28 at 3-7.) The Wellpath-employee Defendants in this action do not advance the third-party release as a defense to Dade's claims. (*See generally* ECF No. 55.) Because the issue is not contested, the Court need not express any opinion on the validity of the third-party release or the adequacy of notice and consent, which are issues best directed to the Bankruptcy Court and District Court for the Southern District of Texas. *See, e.g.*, *Davis v. St. Amour*, No. 23-00593 2026 WL 820668, at *3 (W.D. Va. Mar. 25, 2026) (citing, *inter alia*, *Patterson v. Mahwah Bergen Retail Grp.*, 636 B.R. 641 (E.D. Va. 2022)); *cf. In re Smallhold, Inc.*, 665 B.R. 704, 717-26 (Bankr. D. Del. 2024) (discussing the consent requirement for third-party releases in the wake of *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024)).

basis of Dade's representations to date, the Court will proceed with Dade's claims against

Wellpath as a part of this case.

<strong>c.  Claims Against Wellpath Employees—Personal Involvement and Supervisory Liability</strong>

Dade names numerous Wellpath employees as Defendants, some of whom occupy

supervisory positions.  "A defendant in a civil rights action must have personal involvement in

the alleged wrongs" to be liable.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *see*

*also Jutrowski v. Township of Riverdale*, 904 F.3d 280, 290 (3d Cir. 2018) ("Each Government

official, his or her title notwithstanding, is only liable for his or her *own* misconduct." (quoting

*Iqbal*, 556 U.S. at 677)).  "Personal involvement requires particular 'allegations of personal

direction or of actual knowledge and acquiescence.'" *Dooley*, 957 F.3d at 374 (quoting *Rode*,

845 F.2d at 1207).  "Although a court can infer that a defendant had contemporaneous

knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must

be actual, not constructive." *Chavarriaga v. N.J. Dep't of Corrs.*, 806 F.3d 210, 222 (3d Cir.

2015) (first citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995); then citing *Rode*,

845 F.2d at 1201 n.6).

Generalized allegations that a supervisory defendant is "in charge of" or "responsible for"

an office or facility are insufficient to allege personal involvement in an underlying

constitutional violation.  *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*)

("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,'

and that liability stemmed merely from defendants' 'belief' that their conduct would be

'tolerated.'  However, a director cannot be held liable 'simply because of his position as the head

of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)).  Liability

under § 1983 cannot be predicated on a *respondeat superior* basis. *See Chavarriaga*, 806 F.3d at

18

227; *Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at \*2 (3d. Cir. Nov. 28, 2022) (*per curiam*).

Claims against supervisory defendants brough pursuant to § 1983 "must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017). There are "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if he or she "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Chavarriaga*, 806 F.3d at 227. A plaintiff's complaint "must identify the supervisor's specific acts or omissions demonstrating the supervisor's deliberate indifference to the inmate's risk of injury and must establish a link between the supervisor, the act, and the injury." *Id.*

Dade names Louis E. Hallman, the CEO of Wellpath Holdings, as a Defendant, and purports to assert claims against him in his individual and official capacity. As to the former, Dade's allegations fail to support any plausible claim (a) that, as the CEO of Wellpath's parent holding company, Hallman is the relevant policymaker specifically as to Wellpath's operations at SCI Phoenix, or even more broadly within the Pennsylvania DOC, or (b) that Hallman had specific knowledge of or personal involvement in Dade's treatment, so the individual-capacity

19

claims must be dismissed.  As to the latter, an "official capacity" claim against Hallman is "arguably not cognizable because although [Wellpath] is a state actor for purposes of § 1983, it is a private entity."  *Kreis v. Northampton Cnty. Prison*, No. 21- 2360, 2022 WL 4236692, at *8 (E.D. Pa. Sept. 14, 2022).  "Generally, a suit against a public officer in his or her official capacity is used to compel that officer to take some official action and that concept is inapplicable to suits against private parties where the entity is also susceptible to suit."  *Id.* (cleaned up) (quoting *Owens v. Connections Cmty. Support Programs, Inc.*, 840 F. Supp. 2d 791, 796 (D. Del. 2012)).  "Even if official capacity suits against individuals who work for private companies are cognizable, the suit would, in effect, be one against the company for whom that individual works."  *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 105 (1985)).  Since Wellpath itself is a named Defendant, and Dade may proceed on his claims against Wellpath through substitution of the Liquidating Trust as described above, even if a claim against Hallman in his "official capacity" were cognizable, it would be duplicative of the claims against Wellpath for the same conduct.  Accordingly, the claims against Hallman will be dismissed.

Dade alleges that Defendants Letizio, Annino, and Saikia either collectively or individually "breached the standard of care" with respect to his treatment.  (Compl. at 15.)  He attributes delays in treatment, medication, and referrals to outside specialists to all three.  (*Id.*)  The Court disregards that conclusory language and looks beyond it to the underlying facts.  *See Palakovic*, 854 F.3d at 220.  As to Defendant Letizio, Dade states that Letizio was "the primary doctor who[m Dade] spoke with personally on many occasions concerning [his] health and condition"; that Letizio was responsible both for overseeing his "day to day health conditions" as well as deciding "who [is] treated and when"; and that Letizio set policies and procedures in his

20

role as Medical Director at SCI Phoenix.[9]  (Compl. at 3, 8, 13.)  The Court understands Dade to allege that it was specifically Defendant Saikia who prevented him from receiving nitroglycerin for nearly one month after it was prescribed.[10]  (*See id.* at 5, 15.)  However, Dade's allegations against Defendant Annino are vague and conclusory and contain no factual detail.  (*See id.* at 5-6.)  Accordingly, the Court concludes that Dade has alleged the personal involvement of Defendants Letizio and Saikia in his claims, but not that of Defendant Annino.[11]

### d.    Remaining Claims Against Individual Wellpath Employees

Dade states a claim to relief against Defendant Walsh.  In January 2023, Walsh diagnosed Dade's bi-lateral carotid stenosis and noted its severity.  (ECF No. 5 at 1-2.)  After the diagnosis, Dade saw Walsh at least twice before he was eventually sent to see the vascular surgeon in June 2023, and at those visits Dade asked Walsh about the delay and was told it was due to six

---

[9]  As discussed above, Defendants dispute that Letizio is a policymaker on the basis that "Wellpath and its employees must follow the DOC's policies and procedures. Wellpath does not have any."  (ECF No. 55 at 24.)  The Court notes Wellpath's frankly implausible assertion that it has no policies and procedures.  This factual dispute may be addressed at the appropriate posture. *See Palakovic*, 854 F.3d at 219-220 (explaining that a court evaluating a motion to dismiss examines the legal sufficiency of a complaint's plausible, non-conclusory allegations, but assumes the veracity of those allegations).  In any event, even if Letizio is not, himself, a policymaker, the Complaint can be read to suggest that he enforced or acquiesced in the collegial review policy as Medical Director of Wellpath, which could also be a basis for supervisory liability.  (Compl. at 20.)

[10]  In a Response to Defendant's Motion to Dismiss, Dade clarifies that he was prescribed the nitroglycerin on July 2, 2024, after his surgery, but that he was denied this medication until July 28, 2024, and that he was sent to the emergency room again on July 26-27 as a result of not receiving this medication.  (*See* ECF No. 60 at 4-5.)  He asserts that Defendant Saikia was his chronic care doctor responsible for his medications.  (*Id.*)

[11]  Even Dade's response to the Motion provides no specific allegations about what care Annino allegedly denied him and, to the contrary, claims she joked with him about his condition during a sick call visit in July or August 2024, after he received surgery.  (*See* ECF No. 60 at 5-6.)  These allegations do not suggest she played any role in preventing him from obtaining the surgery at issue in this case.

hundred other inmates waiting for outside care; Walsh also refused to provide Dade with medication to prevent blood clotting or "information on the do's and don'ts" for Dade's condition. (*Id.* at 2-3.) Dade's allegation that Walsh diagnosed a serious medical condition and then delayed or denied treatment for that condition is sufficient to state a claim to relief.

Dade has also stated a claim to relief against Defendant Yodh. Dade alleges that he went to a sick call in December 2023 complaining of numbness and tingling in his arm and shoulder and trouble breathing, and Defendant Yodh told him to come back when he had lost control of his bowels and bladder "and then they will send him for outside medical care." (ECF No. 5 at 5; *see also* Compl. at 3.) This allegation is sufficient to state a deliberate indifference claim against Defendant Yodh.

However, Dade does not state any claim against other Wellpath employees who were at times involved in his care. As to Defendant DeFrangesco, Dade alleges that he saw her in 2018, she ordered an ultrasound, told Dade that if he did not her from her "that would be a good thing," and then she never followed up. (ECF No. 5 at 1.) Even assuming any claim against DeFrangesco could be deemed timely, this bare allegation is insufficient to support a claim for deliberate indifference. It is not clear from Dade's allegations that DeFrangesco was aware of the result of the ultrasound she scheduled, was solely responsible for following up on Dade's care—as opposed to someone at "medical" (*id.* at 1)—or that she prevented Dade from following up in a manner reflective of deliberate indifference. As to Defendants Frusco and Gonzales,[12] Dade alleges that they took his blood pressure, found it to be dangerously high, gave him medication and sent him back to his cell, then immediately recalled him to the medical

---

[12] No appearance has been entered on behalf of Defendant Gonzales, and the Court is unclear whether Gonzales is an employee of Wellpath or the DOC. In any event, the Court will exercise its authority under § 1915 to screen Dade's Complaint as to any claims against Gonzales.

department because they concluded he was having a medical emergency and needed to go for outside treatment. (*See* ECF No. 5 at 5-6.) These allegations reflect that Frusco and Gonzales treated Dade in response to his symptoms and obtained medical care for him—including sending him to the hospital relatively quickly where he finally obtained the surgery he needed—so it is not plausible that they acted with deliberate indifference. As to Defendant Senkowski, Dade only alleges that she told him at a visit to sick call that there was no "specific plan of action" for his treatment in May 2023. (Compl. at 8-9; *see also* ECF No. 5 at 3.) These undeveloped facts do not support claims of deliberate indifference, as they provide no context, including the reason that Dade was being treated by Senkowski on that occasion. As the allegations against Senkowski are undeveloped and are perhaps most reasonably read to infer that she was informing Dade of the status of his medical care during a sick call visit, (*see* ECF No. 60 at 5 (alleging that Senkowski reported the absence of a plan per Walsh's note in Dade's medical chart)), Dade has not alleged a basis for a deliberate indifference claim against Senkowski,[13] *see Iqbal*, 556 U.S. at 680 (stating that a complaint must nudge claims "across the line from conceivable to plausible" (citing *Twombly*, 550 U.S. at 545)).

3. **Defendants Huner and Terra**[14]

Dade has stated a claim to relief against Defendant Huner. He makes specific allegations that Huner has personal involvement in coordinating and scheduling his outside treatment and

---

[13] The caption of the Complaint lists two additional "Doe" Defendants who have not been identified. It is unclear for whom they work but, more importantly, there are no facts alleged against them as to their personal involvement in Dade's medical care. Accordingly, the claims against these Defendants will be dismissed, pursuant to § 1915(e)(2)(B)(ii), on that basis.

[14] Dade has confirmed that his claims against these Defendants are brought in their individual capacities only. (ECF No. 69 at 7.) Accordingly, the Court need not address arguments for the dismissal of official capacity claims against these Defendants. (ECF No. 48, 7-8.).

that she failed to do so, despite awareness that his medical needs were urgent. In particular, Dade alleges that, after he was told by the vascular surgeon in June 2023 and again in October 2023 that he had to see a neurologist before he could be scheduled for surgery, Huner did not arrange a neurology appointment until February 2024. Dade specifically alleges that Huner sent him back to the vascular surgeon instead of a neurologist in October 2023, causing further delay, and that she told him she "does all the scheduling" and that "she would back track and try to fix it." (ECF No. 5 at 4.) He also alleges that Huner knew the severity of Dade's condition because she discussed the possibility of compassionate release with him. (*See id.*) Dade's allegations are sufficient to allege Huner's personal involvement through specific facts—not just by virtue of her title—and to support a claim that Huner was deliberately indifferent to his needs by "prevent[ing him] from receiving recommended treatment for serious medical needs or deny[ing] access to [a] physician capable of evaluating the need for such treatment."[15] *Monmouth Cnty.,*

---

[15] Defendants Huner and Terra have moved in the alternative for summary judgment. (*See* ECF No. 48.) Such "hybrid" motions are disfavored in the cases brought by *pro se* prisoners because of the potential to cause confusion and delay. *See, e.g., Ferranti v. Dixon,* No. 14-3331, 2015 WL 5882797, at \*4-6 (D.N.J. Oct. 6, 2015) (citing, *inter alia, Renchenski v. Williams,* 622 F.3d 315, 340-41 (3d Cir. 2010)). Given the procedural difficulties and delays in this case to date, the Court declines to consider summary judgment in the alternative at this stage. To the extent that Defendants' request to dismiss Dade's claims based on purported deficiencies in exhausting his administrative remedies is intended as an argument for dismissal pursuant to Rule 12(b)(6), as opposed to an argument for summary judgment, the Motion is denied. (*See* ECF No. 48 at 10-12.) Dade has not averred that the grievances he attached as Exhibits to his Complaint constitute the complete grievance record, and he has no burden at the pleading stage to overcome an exhaustion defense. *See Jones v. Bock,* 549 U.S. 199, 216 (2007) (holding that exhaustion is an affirmative defense that the defendant must plead and prove); *Talley v. Clark,* 111 F.4th 255, 264 (3d Cir. 2024) ("The Supreme Court has explained that the ordinary pleading rule—that a plaintiff need not plead the absence of an affirmative defense or otherwise plead around it— applies in the PLRA context."); *Schmidt v. Skolas,* 770 F.3d 241, 248 (3d Cir. 2014) ("[A] complaint need not anticipate or overcome affirmative defenses . . . ."); *Ray v. Kertes,* 285 F.3d 287, 297 (3d Cir. 2002) ("[N]o provision of the PLRA requires pleading exhaustion with particularity."). In this instance, the question of exhaustion is not conclusively resolved on the face of the Complaint, so the Court declines to dismiss any claims on that basis. *See Talley,* 111 F.4th at 264 (quoting *Ray,* 285 F.3d at 297). And to the extent that Huner relies on her Affidavit

24

834 F.2d at 346-47 (citation omitted); *see also Burke v. Regalado*, 935 F.3d 960, 993 (10th Cir. 2019) ("[I]f the [prison] official knows [her] role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if [s]he delays or refuses to fulfill that gatekeeper role due to deliberate indifference, [s]he also may be liable for deliberate indifference." (internal quotation marks, ellipsis, and citation omitted)).

Dade has also stated a claim to relief against Defendant Terra. For the same reasons described above in relation to supervisory liability, Terra cannot be liable simply based on a theory of *respondeat superior*; that is, he is not liable simply because he is a supervisor and his subordinates violated Dade's rights. *See Chavarriaga*, 806 F.3d at 227. However, Terra may be personally liable under if he "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.* Dade does allege that Terra "is responsible for the oversight and operation of the prison" (Compl. at 4), which alone would be insufficient to plead Terra's personal involvement. However, Dade goes on to allege that Terra had actual knowledge that he was not receiving treatment, and that this knowledge was derived not just from reviewing grievances, but instead because Dade spoke directly with Terra about his lack of treatment during Terra's rounds. (*Id.*) Dade specifically alleges that Terra "even told [Dade] that they will not operate on the blockage in his neck until it is 70 percent blocked." (*Id.*) Dade also alleges

---

stating that Wellpath employees are responsible for referrals to and scheduling appointments with providers outside the prison, and Huner as CHCA plays no role in those decisions, that is a dispute of fact over her involvement in Dade's claims as pleaded. (*See* ECF No. 48-1; *see also* ECF No. 48 at 16 ("[T]he CHCA acts in a 'management capacity,' overseeing administration of the health and dental departments of the prison, nursing staff, and independent contractors.")). That factual dispute might be resolved through discovery, or it might not and will require factfinding; in either event, it is not grounds for dismissal of Dade's claims at this stage. *See Doe v. Princeton Univ.*, 30 F.4th 335, 342 (3d Cir. 2022).

25

that the Pennsylvania Prison Society contacted Terra about the urgency of Dade's medical needs, and Dade appends Exhibits to his Complaint to support that allegation. (*Id.* (citing ECF No 2 at 16-24).)  In sum, Dade has sufficiently alleged Terra's personal involvement in his claim.

As Defendants Huner and Terra point out, "for non-medical officials, a complaint must allege actual or constructive knowledge by prison officials that the prison doctors or their assistants mistreated or failed to treat plaintiff." (ECF No. 48 at 15 (citing *Spruill* v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).)  Dade has alleged precisely that: Huner and Terra had actual knowledge that Dade needed urgent treatment outside the prison, had been recommended for that treatment by medical personnel inside the prison, and had yet to receive that treatment. Moreover, he alleges their personal involvement in the delays in his treatment.  That is sufficient to state a claim to relief at this stage. *Cf. Gordon v. Schilling*, 937 F.3d 348, 358 (4th Cir. 2019) ("Rather than seriously considering Gordon's requests for HCV treatment and endeavoring to discover why he was not receiving it, Schilling—as the Health Services Director—repeatedly passed the buck")

### 4.    Statute of Limitations

Dade's claims under § 1983 are subject to a two-year statute of limitations. *See Kach v. Hose*, 589 F.3d 626, 634 (3d Cir. 2009) (citations omitted).  "A complaint is subject to dismissal for failure to state a claim on statute of limitations grounds only when the statute of limitations defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017) (citation omitted).  Defendants Huner and Terra argue that Dade's claims are time-barred, because he mentions "an alleged failure of treatment that occurred 'over six (6) years ago'" in his Complaint and "states he spoke to a physician 'over (4) years ago about the situation'" in one of his Exhibits. (ECF No. 48 at 10 (citing Compl. at 29 and ECF No. 2 at 2).)

As described above, Dade alleged that he was seen by Dr. Jeanne DeFrangesco in 2018, she ordered an ultrasound and told Dade that if he did not "hear anything from her or medical that would be a good thing," and then she did not follow up and Dade "never received verification or results." (ECF No. 5 at 1; *see also* Compl. at 4-5.) Dade then alleges that he was diagnosed in January 2023 with an "urgent, serious emergency medical condition," and yet his treatment was delayed after that diagnosis. (Compl. at 8.) Defendants Huner and Terra are alleged to have personal involvement in delaying his treatment after the 2023 diagnosis, as described above.

"Federal law, not state law, determines when a limitations period begins to run." *Nguyen v. Pennsylvania*, 906 F.3d 271, 273 (3d Cir. 2018) (citing *Kach*, 589 F.3d at 634). A statute of limitations begins to run "from the moment that a claim accrues," which is "when the last act needed to complete the tort occurs." *Id.* (citing *Kach*, 589 F.3d at 634). However, "state tolling principles [ ] govern § 1983 claims," unless the state tolling principles contradict federal law or policy, in which case, the federal principles will govern. *Kach*, 589 F.3d at 639 (citations omitted). In Pennsylvania, "lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Davis v. Wells Fargo*, 824 F.3d 333, 344 n.13 (3d Cir. 2016) (quoting *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983)). However, the discovery rule may delay the running of the statute of limitations in certain circumstances. *See Nicolaou v. Martin*, 195 A.3d 880, 892 (Pa. 2018) ("[T]he discovery rule tolls the statute of limitations where the plaintiff is reasonably unaware that he has been injured and that his injury has been caused by another party's conduct." (citing *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005))). Given Dade's allegation that he never received a follow-up in 2018 after having been told that silence would be "a good thing," the Court does not see any grounds to run the statute of limitations from that earlier date, as opposed to the date he learned of his

27

diagnosis in 2023. Any time bar as to Dade's claims against Defendants Huner and Terra is not apparent on the face of the Complaint—to the extent it exists at all—and the argument on behalf of these Defendants does not engage with the discovery rule or the appropriate accrual date of Dade's claims against them specifically. Accordingly, their Motion to Dismiss is denied in this respect.

### 5.   Defendants Deutsch and Ilano

Defendants Deutsch and Ilano have moved to dismiss, arguing primarily that Dade has not pleaded sufficient facts to suggest that they are state actors. (*See* ECF No. 56 at 9-10.) "Whether or not outside medical providers, to whom prison officials refer inmates for medical treatment that the prison cannot itself provide, can be deemed to be state actors generally turns on whether those providers do so pursuant to a contract with the state." *Collazo v. Rosenthal*, No. 23-3475, 2023 WL 8720136, at *3 (E.D. Pa. Dec. 18, 2023) (citing, *inter alia*, *Illescas v. Annucci*, No. 21-8473, 2022 WL 17539696, at *4 (S.D.N.Y. Dec. 7, 2022) (collecting cases and distinguishing between defendants that treat prisoner plaintiffs at private hospitals where there is no allegation that the treatment is "provided pursuant to a contract between the government and the private hospital" and non-public medical providers that provide inmates with medical treatment outside of a prison pursuant to a contract, and holding that the latter may be state actors)). In his Complaint, Dade alleges that Defendant Deutsch "is employed by Jefferson Einstein Healthcare Network as a vascular surgeon[, a]nd was *contracted* to access and plan [Dade]'s operational procedures which Defendant delay[ed]/denied for months[, a]ccording to Doctor Letizio." (Compl. at 6 (emphasis added).) The Court concludes that, for the purposes of the Motion to Dismiss, Dade has sufficiently alleged that Defendant Deutsch is a state actor. However, in naming the John Doe vascular surgeon later identified as Defendant Ilano, Dade

28

does not include the allegation that Ilano was contracted to provide services, (*see id.* at 6-7), so the Court cannot draw the same conclusion as to Ilano.

In any event, even assuming that Defendants Deutsch and Ilano were acting under color of state law, Dade does not state facts to suggest their deliberate indifference. As to Defendant Deutsch, Dade alleges that, at the first visit in June 2023, he instructed Dade to see a neurologist prior to any other steps Deutsch could take to address his condition. When Dade was sent back to Deutsch again in October 2023 without having seen a neurologist, Deutsch told him the same thing. While such allegations might support deliberate indifference claims against those responsible for referring Dade for diagnosis and treatment, as discussed above, they reflect nothing more than the exercise of medical judgment by Deutsch. As to Defendant Ilano, even considering the Complaint's mention of the John Doe vascular surgeon later identified as Ilano, the allegations are wholly conclusory and not supported by any facts; indeed, Dade does not indicate when he was treated by Ilano. Accordingly, the Motion to Dismiss filed by Defendants Deutsch and Ilano will be granted.

B.    **State Law Claims**

Dade also asserts claims under Pennsylvania law. First, he asserts professional negligence claims against Defendants Hallman, Letizio, Huner, and Saikia, and vicarious liability for Wellpath as to those claims. (*See* Compl. at 21.) Pennsylvania courts define medical malpractice as "the unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Hagans v. Hosp. of the Univ. of Pa.*, 343 A.3d 251, 265 (Pa. Super. Ct. 2025) (internal quotation marks and citation omitted). A plaintiff claiming medical malpractice must demonstrate: (1) a medical practitioner owed a duty to him; (2) a

breach of that duty by the practitioner; (3) the breach was the proximate cause of the harm suffered; and (4) the damages suffered were a direct result of the harm. *Id.*; *Toogood v. Rogal*, 824 A.2d 1140, 1145 (Pa. 2003); *see also Munoz v. Children's Hosp. of Phila.*, 265 A.3d 801, 806-07 (Pa. Super. Ct. 2021) (discussing duty of care under Restatement (Second) of Torts, § 323); *Munoz v. Children's Hosp. of Phila.*, 2025 WL 1504354, at *8-9 (Pa. Super. Ct. 2025) (unpublished opinion) (discussing duty of care).

Dade cannot satisfy the first element as to Defendants Hallman and Huner, because they are not medical practitioners. As to Defendants Letizio and Saikia, they move for dismissal of the professional negligence claims solely on the basis that Dade did not comply with the Certificate of Merit requirements under Pennsylvania Rule of Civil Procedure 1043.3(e). (*See* ECF No. 55 at 25-28.) In light of recent United States Supreme Court precedent, the motions will be denied. *See Berk v. Choy*, 607 U.S. ---, 146 S. Ct. 546, 557 (2026) (holding state law requiring submission of an affidavit from a medical professional attesting to the suit's merit has no application in federal court); *see also DiFraia v. Ransom*, --- F.4th ---, No. 24-2673, 2026 WL 878627, at *7 (3d Cir. Mar. 31, 2026). ("Our precedent applied Pennsylvania's [Certificate of Merit] rule to state-law medical-malpractice claims brought in federal court. But the Supreme Court just abrogated that precedent, holding that Delaware's analogous requirement did not apply in federal court." (first citing *Liggon-Redding v. Est. of Sugarman*, 659 F.3d 258, 264-65 (3d Cir. 2011); then citing *Berk*, 146 U.S. at 557)). Wellpath argues only that it cannot be vicariously liable because the underlying claims were not supported by a Certificate of Merit. (*See* ECF No. 55 at 28.) Because Defendants Wellpath, Letizio, and Saikia offer no substantive argument on the merits of Dade's claims in the alternative, they have not carried their burden.

Second, Dade asserts a corporate negligence claim against Wellpath. "Corporate negligence in a medical care context is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed to the patient, which is to ensure the patient's safety and well-being while at the hospital." *McDonald-Witherspoon v. City of Philadelphia*, 481 F. Supp. 3d 424, 452-53 (E.D. Pa. 2020) (cleaned up) (quoting *Welsh v. Bulger*, 698 A.2d 581, 585 (1997); and citing *Fox v. Horn*, No. 98-5279, 2000 WL 49374, at *8 (E.D. Pa. Jan. 21, 2000) (concluding that the Pennsylvania Supreme Court would decide that organizations that "contract[ ] to provide medical services to state inmates, can be held liable under the theory of corporate negligence")), *aff'd*, No. 21-1019, 2021 WL 6101246 (3d Cir. Dec. 21, 2021). "Because the duty to uphold the proper standard of care runs directly from the hospital to the patient, an injured party need not rely on the negligence of a third-party, such as a doctor or nurse, to establish a cause of action in corporate negligence." *Id.* (quoting *Welsh*, 698 A.2d at 585). "A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees. Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts." *Id.*

Wellpath appears to recognize that Dade asserts a claim for corporate negligence. (*See* ECF No. 55 at 6, 11.) However, Wellpath only argues against imposing *Monell* liability or vicarious liability; at no point does the Motion to Dismiss appear to defend against a corporate negligence claim under state law. (*See generally id.* at 21-25, 28-30.) Accordingly, Wellpath has not carried its burden, and the Motion to Dismiss will be denied in this respect. However, as discussed above, Dade may only proceed with claims against Wellpath through the Liquidating Trust.

31

## V.     CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the Motions to Dismiss as follows: Wellpath's Motion to Dismiss It as a Party Following Bankruptcy Discharge (ECF No. 32) will be granted, and the Liquidating Trust will be added as the party that assumed Wellpath's liability for Dade's claims.  The Motion to Dismiss or in the Alternative for Summary Judgment filed by Defendants Huner and Terra (ECF No. 48) will be granted only to the extent it seeks dismissal of Dade's state tort claim against Huner, and denied in all other respects.  The Motion to Dismiss filed by Wellpath and its employees, (ECF No. 55), will be granted to the extent that it seeks dismissal of the claims against Defendants Hallman, DeFrangesco, Annino, Senkowski, and Frusco, and denied in all other respects.  The Motion to Dismiss filed by Defendants Deutsch and Ilano, (ECF No. 56), will be granted.  For the sake of clarity, the following claims shall proceed:

- the Eighth Amendment claims for deliberate indifference to medical needs against Defendants Letizio, Sakia, Walsh, Yodh, Huner, and Terra;

- the state law claims for professional negligence against Defendants Letizio and Saikia;

- the *Monell* claims, and state law claims for professional and corporate negligence against Wellpath, through the Wellpath Liquidating Trust.[16]

---

[16] The Court previously provided Dade with opportunities to file an amended complaint, and extensions of time to do so, explaining that there may be consequences for a failure to amend. (*See* ECF Nos. 27, 29, 31.) Nonetheless, Dade failed to respond with a timely and compliant amendment, and the Court proceeded with his original Complaint as the operative pleading. (ECF No. 34.) The parties have accordingly filed extensive briefing on the original Complaint. The Court has afforded Dade liberal construction of his pleadings in evaluating his Complaint and the Defendants' Motions. The Court concludes that, at this time, sufficient grounds do not exist to provide Dade with leave to amend. However, nothing in this Memorandum or its accompanying Order should be construed to prevent or preclude Dade from seeking leave to amend at a later date in accordance with Federal Rule of Civil Procedure 15.

Defendants Letizio, Sakia, Walsh, Yodh, Huner, and Terra and the Wellpath Liquidating Trust shall file responsive pleadings in accordance with the Federal Rules of Civil Procedure. An appropriate order follows.

BY THE COURT:

/S/ Kai N. Scott
**KAI N. SCOTT, J.**